**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 14-cr-467-3 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| DEBRA A. SCHULTZ | ) | |

**MEMORANDUM OPINION AND ORDER**

The United States of America ("Government") has charged Defendant Debra A. Schultz ("Defendant") with three counts of wire fraud, 18 U.S.C. § 1343, in connection with an alleged scheme to defraud a not-for-profit organ procurement organization. [See 1.] Before the Court are two of the Government's motions *in limine*: (1) to exclude certain testimony from Defendant's expert witness, Lee Williams [107]; and (2) to limit certain evidence regarding a co-Defendant's gambling activities [79]. For the reasons set forth below, the Government's motion to limit Mr. Williams's expert testimony [107] is granted in part and denied in part, and the Government's motion to limit gambling activity evidence [79] is granted. This case remains set for a status hearing on January 5, 2017 at 1:30 p.m. and a jury trial to commence on January 9, 2017.

**I.    Background**

This case stems from an alleged scheme to defraud a nonprofit that coordinated organ and tissue donations in Illinois and Indiana. Co-Defendant Shari Hansen worked for this non-profit as an auditing coordinator. Hansen allegedly helped create and approve false organ donation invoices, some of which listed Defendant's minor son as the physician performing the procedure. The payments generated by these fake invoices were allegedly deposited into a bank account that Defendant opened in her son's name as well as other bank accounts, some of which were

controlled by Defendant. The Government alleges that Defendant kept a portion of these proceeds for herself and gave the rest to Hansen. Hansen and another co-Defendant have pled guilty, and Defendant is set to go to trial before a jury on January 9, 2017.

## II. Defendant's Expert Testimony

The Government and Defendant intend to rely on expert witnesses to summarize the bank records at issue in this case. Defendant disclosed former Internal Revenue Service ("IRS") agent Lee Williams, who produced a written summary of his opinions and several charts summarizing various bank records. See Fed. Crim. R. 16(b)(1)(C). The Government moves to exclude three aspects of Williams's testimony under *Daubert*: (1) handwriting opinions; (2) credibility and state of mind opinions; and (3) opinions based on inadmissible hearsay. [See 107.] The Government also seeks to limit Williams's testimony about Hansen's gambling. [See 79.]

### A. Legal Standard

Federal Rule of Evidence ("Rule") 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert testimony. See *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009); see also Fed. R. Evid. 1101(b) (Federal Rules of Evidence apply in criminal cases). Rule 702 permits the admission of expert opinion testimony if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Trial courts are obligated to act as a gatekeeper to ensure that the expert testimony is both relevant and reliable. See *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–49 (1999); *Daubert*, 509 U.S. at 589. The purpose of the *Daubert* inquiry is to scrutinize proposed expert witness testimony to determine whether it has "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" so as to be deemed reliable enough to present to a jury. *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Kumho Tire*, 526 U.S. at 152).

To determine relevance, the proponent must show that the expert's "reasoning or methodology properly can be applied to the facts in issue," and "the testimony will assist the trier of fact with its analysis of any of the issues involved in the case." *Daubert*, 509 U.S. at 593; *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000); Fed. R. Evid. 702. To determine reliability, the proponent must show that the expert's testimony is based on "sufficient facts or data," that it is "the product of reliable principles and methods," and that those methods have been "reliably applied * * * to the facts of the case." Fed. R. Evid. 702. Expert testimony may not be based on "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). District courts have "great latitude in determining not only *how* to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable." *Pansier*, 576 F.3d at 737. And "*any* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994).

Thus, in evaluating a motion to exclude expert testimony under Rule 702 and *Daubert*, the Court considers whether the proffered expert (1) is qualified, (2) has employed a reliable methodology, (3) offers opinions that follow rationally from the application of the expert's methodology and qualifications, and (4) presents testimony on a matter that is relevant to the case at hand. See *Kumho Tire*, 526 U.S. at 151–53; *Joiner*, 522 U.S. at 146; *Daubert*, 509 U.S. at 589–93; *Walker v. Soo Line R. R. Co.*, 208 F.3d 581, 586 (7th Cir. 2000). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

B.  Analysis

1.  Handwriting Opinions

Interspersed within Williams's summary of accounting issues are various opinions on handwriting samples. For example, Williams concludes that certain signatures are "obvious forgeries," which he determined by comparing the signatures endorsing some bank checks with the signatures on other checks. [107-1, at 3.] He also compares the signatures on the payee line, endorsement, and authorizing line of certain checks, and concludes that some of these signatures are "obviously the same," which means "Hansen forged [Defendant's] name." *Id.* at 8.

The Government argues that Williams lacks qualifications as a handwriting comparison expert and cannot otherwise testify regarding handwriting under Rule 901(b)(2). See Fed. R. Evid. 901(b)(2) (providing that a "nonexpert" may testify that "handwriting is genuine, based on a familiarity with it that was not acquired for the current litigation"); see also *Deputy v. Lehman Bros.*, 345 F.3d 494, 509 n.6 (7th Cir. 2003). Williams's resume does not list any specific qualifications or background related to handwriting analysis [107-2, at 2], and Defendant does not dispute his lack of qualifications. Likewise, Defendant does not contend that Williams had any familiarity with Defendant, Hansen, or their signatures before this litigation, making Rule 901(b)(2) inapplicable. However, Defendant states that she intends to testify first "as to the handwriting samples," and Williams will "merely indicate his reliance on [Defendant's] statements in helping him determine which money went where." [108, at 8.] Defendant further states that "[i]f the government chooses to cross examine him on such reliance, then the door will be open to explain his opinion for relying on Schultz's representations." *Id.* at 8–9.

Defendant's concession does not clarify much. Williams did not opine on handwriting samples to "determine which money went where." He opined on which signatures were

"forgeries" and *who* forged those signatures.[1] Defendant cannot offer equivalent testimony as a lay witness, nor can Williams piggyback on Defendant's testimony that some of the signatures were not hers to offer expert forgery testimony.

The entirety of Williams's expert handwriting "analysis" is that some of the signatures that he examined are "similar in style"—how, he does not say—and that "the capital letter S in Shari and in Schultz leave little question that" Hansen forged Defendant's signature. [107-1, at 8.] Williams does little more than subjectively eyeball the various signatures and reach a bottom-line conclusion. He does not describe any method for comparing handwriting, let alone whether this methodology has been tested or subject to peer review, there are any standards controlling this methodology, there are any know error rates, or his handwriting comparison methods are generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-94; see also *United States v. Saelee*, 162 F. Supp. 2d 1097, 1102–04 (D. Alaska 2001) (barring handwriting expert's testimony as to conclusions and mere description of similarities and difference absent tested principles for making such comparisons). The conclusion about what is or is not an "obvious" forgery—assuming something so "obvious" could still require *expert* testimony, see Fed. R. Evid. 702(a)—or who committed the forgery is little more than *ipse dixit* and inadmissible. *Joiner*, 522 U.S. at 146. Williams's "expert" testimony does not become admissible simply because Defendant testifies that a signature is not one that she made.

Accordingly, the Court grants the motion *in limine* to preclude Williams from offering handwriting comparison, forgery, or identification opinions. If Defendant testifies that the signatures on certain checks were not hers, Williams may only testify about the relevant accounting features of these checks, such as the deposit dates, amounts, account numbers, and

---

[1] The fact that Williams goes beyond describing whether any signature is "genuine" and opines on who committed the forgery is one more reason that Rule 901(b)(2) could not save his opinion.

trace the flow of funds from these checks. The Government does not "open the door" to any "forgery" opinions merely through cross-examining Williams on these subjects.

### 2. Credibility, State of Mind, and Gambling Opinions

Williams also makes several comments about other witness's intentions, truthfulness, and credibility. For example, he opines that the "forgeries" described above are a "pattern of behavior indicative of [Hansen's] intent to conceal her involvement in these transactions and shoulder the blame on someone else." [107-1, at 3.] He opines that Hansen's gambling practices are "significant[]" because they "go[] to [her] credibility as a witness." *Id.* at 5. He elaborates that she "could be considered to have a gambling addition with all the issues that are attached to that." *Id.* at 5–6. He also opines that postal inspector's grand jury testimony was "incomplete and inaccurate" in light of certain evidence the government had in its possession at the time, commenting that this testimony is "inconceivable when considering the evidence of Shari Hansen's gambling activity." *Id.* at 6.

As Defendant concedes [108, at 7–9], this testimony is well outside the bounds of permissible expert testimony. An expert's assertions about another person's "intent" are neither helpful nor admissible under Rule 702. See, *e.g.*, *Klaczak v. Consol. Med. Transp. Inc.*, 2005 WL 1564981, at *8 (N.D. Ill. May 26, 2005); *Dahlin v. Evangelical Child and Family Agency*, 2002 WL 31834881, at *3 (N.D. Ill. Dec. 18, 2002); *Isom v. Howmedica, Inc.*, 2002 WL 1052030, at *1–2 (N.D. Ill. May 22, 2002); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004). Similarly, "an expert cannot testify as to credibility issues." *Goodwin v. MTD Prods., Inc.*, 232 F.3d 600, 609 (7th Cir. 2000); accord *United States v. Hall*, 165 F.3d 1095, 1107 (7th Cir. 1999); *United States v. Vest*, 116 F.3d 1179, 1185 (7th Cir. 1997); *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005); *Lippe v. Bairnco Corp.*, 288 B.R.

678, 687 (S.D.N.Y. 2003). Williams is not better qualified than the jury to draw inferences regarding anyone's "intent" or "credibility," and his speculation about witness's credibility, the accuracy of prior testimony, and gambling addition are not based on any "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702(a). Opinions like these are prohibited.[2]

To the extent the Government seeks to preclude Williams "from offering any testimony regarding Hansen's gambling activities" [107, at 11], that request is overbroad. Williams analyzed various casino and ATM records and opines on the dates that Hansen withdrew cash at the casino ATMs. The Government does not specifically challenge the reliability or relevance of these opinions. Thus, Williams can testify—consistent with his experience and expertise, based on an appropriate foundation, and within the confines of Rules 702 and 703—about the dates, locations, and amount of funds withdrawn by Hansen in connection with gambling.

In its other motion *in limine* [79], the Government requests exclusion of Williams's opinions about Hansen's aggregate gambling activities. Specifically, Williams opines on the total number of days Hansen gambled per year and her average frequency of gambling (*e.g.*, once every three days). [See 107-1, at 4–5.] The Government challenges this testimony as irrelevant and inadmissible under Rule 403. At the December 15, 2016 pretrial conference, Defendant's counsel agreed that he would not offer this evidence to impeach Hansen—that is, to show Hansen is not credible because she gambles—but merely to trace where Hansen withdrew the proceeds from her alleged scheme. Accepting that representation, then summary evidence of Hansen's gambling activities in the aggregate is not relevant. Evidence that, for example, Hansen gambled 100 times in a year does not make any fact about tracing the flow of particular

---

[2] As both the Government and Defendant recognize, the postal inspector's grand jury testimony may be relevant for purposes of impeachment during the postal inspector's own testimony. [107, at 12; 108, at 8.] Nothing about that possible use would permit Defendant to admit this testimony through Williams or open the door to Williams's credibility opinions.

7

funds withdrawn from a casino ATM more or less likely, and the risks of unfair prejudice, confusion, and misleading the jury substantially outweigh any probative value from such aggregation evidence. Accordingly, the Court grants Defendant's motion [79] to limit Williams from testifying about the total number of days and the frequency with which Hansen gambled.

### 3. Hearsay Statements

The Government also seeks to preclude Williams from offering Defendant's out-of-court statements in the course of offering his expert opinions. These include how Defendant received checks from Hansen [107-1, at 3], whether Defendant examined the name of the payee on the check before depositing the checks (*id.*), how Hansen instructed Defendant to make cash withdrawals to give to Hansen (*id.* at 6–7), the reason Defendant purportedly wrote two checks to Hansen (*id.* at 7), and how Hansen and Defendant agreed to make payments to the IRS to conceal the alleged scheme (*id.*). The Government contends all of this testimony is hearsay or hearsay within hearsay, and Defendant cannot circumvent the rules of evidence and cross-examination by relating otherwise inadmissible evidence to the jury through an expert.

In response, Defendant reiterates that she plans to testify, which would occur prior to Williams's testimony. Williams "would only be repeating such statements to the extent that they provide context for the investigative work he had done." [108, at 3.] Even with this limitation, Defendant concedes that Williams cannot testify about the first two points above (*i.e.*, how Defendant received the checks and deposited them without examining the payee name). *Id.* at 7.

This concession effectively resolves the Government's motion. If Defendant testifies first and the testimony on these particular subjects is admitted, then Williams can testify about (1) whether his forensic accounting analysis is consistent with that testimony, and (2) how to interpret the various bank records in light of that testimony. Since Defendant's testimony will be

heard by the jury, there will be no need to address whether otherwise inadmissible "facts or data" should be disclosed to the jury under Rule 703.

As Defendant concedes, Williams cannot repeat statements to the jury that are not based on in-court testimony. [108, at 4.] Nor should Williams simply repeat Defendant's testimony and vouch for its truth. See, *e.g.*, *Bundy v. Transp. Desgagnes, Inc.*, 2009 WL 3526189, at *3 (N.D. Ind. Oct. 23, 2009) ("An expert can assume certain facts and base his opinions on those facts as long as he isn't vouching for the credibility of witnesses."). For example, Williams should not opine that "Defendant wrote Hansen check X to pay for Hansen's daughter vacation," but could opine that "X is the check that Defendant testified she wrote to Hansen to pay for Hansen's daughter's vacation, and the following bank activity shows that, in fact, these funds were used for Hansen's daughter's vacation." This is the difference between an expert assuming a statement is true as a premise of his opinion and an expert offering those statements as his opinion. The former is routine and governed by Rule 703. The latter is largely how Williams's summary report reads and raises hearsay concerns. See *Matter of James Wilson Assocs.*, 965 F.2d 160, 173 (7th Cir. 1992); *United States v. Beavers*, 756 F.3d 1044, 1054–55 (7th Cir. 2014).

These issues will be squarely presented if Defendant does not testify, and the Government is free to renew its motion if that comes to pass. Inadmissible hearsay does not become admissible simply through the imprimatur of an expert. Some of Defendant's statements may be admitted for their effect on Williams in establishing the course of his investigation (*e.g.*, his investigation into the IRS payments). See *United States v. Taylor*, 569 F.3d 742, 749 (7th Cir. 2009). Accountants can reasonably rely on witness interviews under Rule 703. See, *e.g.*, *Simon v. Weissmann*, 301 F. App'x 107, 116 (3d Cir. 2008); *Local 159, 342, 343 & 444 v. Nor-Cal Plumbing, Inc.*, 189 F.3d 473, at *8 (9th Cir. 1999); *Int'l Adhesive Coating Co. v. Bolton*

*Emerson Int'l, Inc.*, 851 F.2d 540, 545 (1st Cir. 1988); *United States v. Affleck*, 776 F.2d 1451, 1457 (10th Cir. 1985). A claim that Defendant's statements are not credible because they were "made with a motive to lie" [107, at 6] is avenue to explore on cross, not a basis for exclusion under *Daubert*. However, *many* of Defendant's statements in Williams's summary appear to be offered for their truth without any nexus to how the statement affected the course of Williams's investigation (*e.g.*, Defendant withdrew cash, deposited a portion in a bank account and gave "the balance in cash" to Hansen "per her instructions."). Williams cannot simply assert that Hansen wanted to hide the money from her husband in the midst of their divorce [see 107-1, at 2] absent a showing as to how this affected the course of his investigation. Oblique evasions of the hearsay rule through expert testimony are impermissible.

### III. Conclusion

For these reasons, the Government's motion to limit Mr. Williams's expert testimony [107] is granted in part and denied in part. The Government's motion to limit gambling activity evidence [79] is granted.

Dated: December 22, 2016

_____
Robert M. Dow, Jr.
United States District Judge